

# NUMBER 13-08-00473-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

| JASON LYNN WHITE, | Appellant, |
|---|---|
| v. | |
| THE STATE OF TEXAS, | Appellee. |

### On appeal from the 156th District Court
### of Live Oak County, Texas.

# MEMORANDUM OPINION

### Before Justices Yañez, Rodriguez, and Benavides
### Memorandum Opinion by Justice Rodriguez

Appellant, Jason Lynn White, was found guilty of murder and sentenced to forty years' confinement, plus a $4,000 fine. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (Vernon 2003).[1] By three issues, appellant contends that the trial court abused its discretion by

---

[1] Pursuant to section 19.02(b)(1) of the penal code, a person commits the offense of murder by (1) intentionally or knowingly, (2) causing the death, (3) of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1) (Vernon 2003).

denying his motion for new trial and that the evidence is legally and factually insufficient to support the jury's rejection of his self-defense claim. We affirm.

## I. Background

On April 28, 2007, appellant visited Charlotte Barrera. While he and Barrera sat outside talking and drinking beer, Barrera's boyfriend, David Earl Logan, stayed inside. Appellant shot his 32.20 caliber gun several times just to pass the time. Logan then stepped outside and turned off the outside lights and the radio. Barrera decided that it was time to go inside and told appellant that Logan "gets angry and he has hit me before."

According to Barrera, she entered the house and assumed appellant was "getting ready to leave." When the dog started barking, Logan got up and went outside to check on the dog. Barrera told Logan not to "mess with" or "kick" the dog. Logan responded by slapping her. Barrera started crying and walked toward Logan, who then "shoved" her, causing her to fall and roll on the floor. As she stood up, Logan "was walking to the kitchen . . . and [she] heard him say . . . . And what the f---- are you going to do, mother f---er." Barrera testified that Logan was standing at the front door, and "he was reaching out the door, reaching out, next thing I know he went – he fell backwards, fell completely backwards."

When asked if Logan threatened appellant, Barrera stated that "David may have – David may have said something, I don't know. Like I said, he cussed out the door, I thought he was cussing at the dog, and I wasn't paying much attention. . . ." Barrera stated that she did not hear Logan tell appellant that he was going to kill him.

Pattie Teague, appellant's live-in girlfriend, testified that appellant told her, "I shot [Logan] . . . . Because he came after me; he said he was going to kill me." However, during the investigation, she told a Texas Ranger that appellant told her that he shot Logan

2

"[b]ecause she [Barrera] wanted me to."  Teague explained that appellant was initially trying to defend Barrera and that he "stepped into a domestic problem, if you want to know the truth of the matter. . . .  He did tell me he did try to leave, and she asked him not to."

Richard Russell, a highway patrolman for the Texas Department of Public Safety, testified that he drove to the scene in response to an emergency call and found Logan's body by the front door of the residence.  Trooper Russell then proceeded to appellant's residence after being advised that appellant had informed a dispatcher that he had shot Logan.  Trooper Russell handcuffed appellant and read *Miranda* warnings to him.  According to Trooper Russell, appellant stated, "You don't have to read that to me, I shot him."  Trooper Russell informed appellant that he had to read the *Miranda* warnings, and appellant stated, "Don't worry about it, I shot him."  After Trooper Russell finished reading the *Miranda* warnings, appellant took Trooper Russell to his closet and showed him the gun he used to shoot Logan.

Desiree Deleon, a dispatcher, testified that she received the call from appellant regarding the shooting.  Appellant told her that he had "shot a guy" because he was scared for his life.  Appellant told Deleon, "I couldn't defend myself with a broken arm and he was threatening me.  He said he was going to kill me.  So I went to my truck and got my gun and shot him."

Reynaldo Fernandez, M.D., testified that he recovered a bullet from the body that was from a 32.20 caliber rifle.  The bullet went into Logan's chest and punctured the aorta.  When asked if a person with that type of injury could still walk around, Dr. Fernandez replied, "This injury didn't hit the spinal cord, it didn't hit the brain, so without hitting the spinal cord or the brain[,] you'd expect them to still be able to walk around or move their

3

arms and legs." When asked whether Logan's body had been moved, Dr. Fernandez replied that he had not viewed the scene and did not have an opinion on that issue.

Oscar Rivera, a Texas Ranger, assisted with the processing of the crime scene. He testified that Logan's body was found lying on the floor inside the residence by the front door. According to Ranger Rivera, when Logan was shot, the shooter was standing outside of the residence at the base of the front porch. Ranger Rivera testified that there was no indication of any weapons around the deceased, and there was no indication that Logan was outside the residence when he was shot. Ranger Rivera stated that he knew Logan was not outside because a hole in the glass door was "consistent with [Logan] standing behind the door." When asked whether Logan's body had been moved after he was shot, Ranger Rivera testified that it had not because there were no blood smears around the body and the splatter on the refrigerator was consistent with a conclusion that Logan fell where he had been shot.

Ranger Rivera testified about inconsistencies in Barrera's, appellant's, and Teague's versions of the events. Ranger Rivera stated that Barrera first told him that on the night of the shooting, "she was asleep, the dog woke them up, that they went to investigate, there was a noise, and Logan fell down back on top of her shot." Barrera claimed she had never heard of appellant; however, Barrera later told Ranger Rivera "[t]hat she now knew who [appellant] was, that he had been to the residence before, and he in fact was at the residence that particular night and was drinking beer at that residence, [and] that he fired some shots." When Ranger Rivera interviewed Barrera on the night of the shooting, she did not tell him that Logan had assaulted her. According to Ranger Rivera, approximately seven days after the shooting Barrera told him that Logan assaulted her. Ranger Rivera

4

believed that Barrera changed her story because she was trying to protect appellant. Ranger Rivera testified that appellant's stories were inconsistent because he first told the dispatcher that he was "fearing his life." When the officers arrived at the scene, he did not tell them that he shot Logan because he was fearful. According to Ranger Rivera, Teague's testimony that appellant "got in between" Logan and Barrera because they were fighting was inconsistent with the evidence at the scene.

Appellant testified on his own behalf. He stated that he had his gun with him because he had gone to visit a friend with whom he had shot skunks on another occasion. When appellant arrived at Barrera's residence, they sat outside in "the barbecue area." After he shot his gun four times, Logan came out and turned off the lights. Appellant told Barrera, "I guess it's best I go home," and Barrera replied, "No, it's all right." Barrera told him that Logan had been drinking whiskey and that "when he drinks whiskey he usually beats the heck out of her." Appellant testified that Logan then "hollered" at Barrera to get her "G.D. ass" in the house. Appellant then described the events leading to the shooting:

[Counsel]: Then you said, "Now it's time for me to go;" what happened?

[Appellant]: Okay she starts walking over there, and I still had the gun in my lap, and I walked over there.

[Counsel]: Why did you walk over there?

[Appellant]: I thought I could calm him down. She got real scared when he said that.

[Counsel]: Was he screaming at her?

[Appellant]: Yes, sir.

[Counsel]: Was he cussing at her?

[Appellant]: He just said, "Get your G.D.A. over here."

5

[Counsel]: That's all he said?

[Appellant]: That's it.

[Counsel]: She's real scared. How do you know she's real scared?

[Appellant]: Because she was shaking real bad.

. . . .

[Counsel]: . . . Are you in front of the porch –

[Appellant]: Yes, sir.

[Counsel]: Where is [Barrera]?

[Appellant]: She was on the ground.

. . . .

[Counsel]: And is she talking to Logan?

[Appellant]: He was going toward her, and then when I told him, "Calm down, let's drink a cold beer" is when he came at me.

. . . .

[Appellant]: Well, he came at me when he told me, he said, "You S.O.B., I'll kill you."

[Counsel]: Did he make a move at you? How did he come at you?

[Appellant]: He just told me he's going to kill me and started at me, and that's when I fired.

[Counsel]: Then what happened?

[Appellant]: He hit the ground, and I was scared, didn't know what to do. And I had that Hanes t-shirt on with that pocket, I usually keep my cell phone in there, but usually when you bend over or something it falls out. I put the gun down and got up on the porch, because I couldn't find my phone. I asked her, "Where's your phone? Where's your phone? Let's call 9-1-1."

Appellant left Barrera's residence and decided to turn himself in.

6

Appellant claimed he was standing on the ground and that Logan was on the porch and coming after him. Appellant could not tell whether Logan had a weapon. According to appellant, appellant shot Logan when Logan came after him. Appellant testified that although he did not recollect what he said to Teague, he did not tell her that Barrera wanted him to shoot Logan. Appellant stated, "There is a lot that night I don't remember, and I said a lot of stuff that night." Appellant stated that he remembered telling the dispatcher that he was scared. Appellant acknowledged that he told the dispatcher that before shooting Logan, he went to his truck and got his gun. However, appellant claimed that statement did not make sense and that he was not sure why he made the statement. Appellant explained, "I guess [I made the statement] because I was in shock. I didn't know what to say at the time."

## II. MOTION FOR NEW TRIAL

By his first issue, appellant contends that the trial court abused its discretion by denying his motion for a new trial because Barrera intentionally withheld evidence that the victim's body had been moved. *See* TEX. R. APP. P. 21.3(e).

### A. Standard of Review

We review a trial court's decision to deny a motion for new trial under an abuse of discretion standard. *Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004). We must decide whether the trial court's decision was arbitrary and unreasonable, and we must not substitute our judgment for that of the trial court. *Id.* "We must view the evidence in the light most favorable to the trial court's ruling and presume that all reasonable factual findings that could have been made against the losing party were made against that losing party." *Id.*

7

## B. Discussion

As his sole ground for a new trial, appellant asserted that evidence tending to establish his innocence was intentionally withheld, thus preventing its production at trial. *See* TEX. R. APP. P. 21.3(e). At the motion for new trial hearing, appellant presented the testimony of Max Scott, an expert trained in forensic event reconstruction, photogrammetry analysis, bloodstain analysis, investigation of violent crime events, three dimensional on-scene measurements, and to-scale diagramming. Scott opined that after Logan was shot, his body was moved approximately three feet from the front porch into the entrance of the house. When asked who may have moved Logan's body, Scott replied, "Well, it's consistent with Barrera, Charlotte Barrera doing it since she would have been the only person available to do it."

Appellant asserts that Scott's opinion establishes that Barrera intentionally withheld evidence that the body was moved. *See id.* However, Scott agreed that evidence showing that the body had been moved could have been presented at trial and that he did not have any evidence to support a conclusion that the evidence was not available to appellant during the trial. Moreover, at trial, appellant asked Ranger Rivera and Dr. Fernandez whether Logan's body had been moved. Ranger Rivera opined that the body had not been moved because there were no blood smears. Dr. Fernandez did not have an opinion. Also, although appellant questioned Barrera during cross-examination, he did not ask her whether Logan's body had been moved.

Therefore, viewing the evidence in the light most favorable to the trial court's ruling, we cannot conclude that the evidence, which appellant claims tended to establish his innocence—that the body had been moved—was intentionally withheld. *See* TEX. R. APP.

8

P. 21.3(e). Therefore, the trial court did not abuse its discretion by denying appellant's motion for a new trial. We overrule appellant's first issue.

## III. SUFFICIENCY OF THE EVIDENCE

By his second and third issues, appellant contends the evidence is legally and factually insufficient to support the jury's rejection of his claim of self-defense.

## A. Self-Defense

Pursuant to section 9.31(a) of the penal code, self-defense is justified when a person reasonably believes that force is immediately necessary to protect himself against the other's use or attempted use of unlawful force. TEX. PENAL CODE ANN. § 9.31(a) (Vernon Supp. 2008).

Furthermore, a person is justified in using deadly force against another:

(1) if he would be justified in using force against the other under Section 9.31;

(2) if a reasonable person in the actor's situation would not have retreated; and

(3) when and to the degree he reasonably believes the deadly force is immediately necessary:

(A) to protect himself against the other's use or attempted use of unlawful deadly force; or

(B) to prevent the other's commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery.

*See* Act of May 16, 1995, 74th Leg., ch. 235, § 1, 1995 Tex. Gen. Laws 2141 (amended 2007) (current version at TEX. PENAL CODE ANN. § 9.32 (Vernon Supp. 2008)).[2]

_____

[2] In 2007, the legislature amended section 9.32 of the Texas Penal Code to remove the necessity for the fact finder to consider the failure of the accused to retreat, with regard to the use of deadly force in self-defense. The offense for which the jury convicted appellant occurred before the effective date of the

9

Once the defendant produces evidence raising the issue of self-defense, the State bears the burden of persuasion to disprove the defense. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). The State's burden of persuasion does not require the production of evidence; it requires that the State prove its case beyond a reasonable doubt. *Id.* Whether the defendant acted in self-defense is a fact issue to be determined by the jury. *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991) (en banc). The jury is free to accept or reject any defensive evidence on the issue of self-defense. *Id.* at 914. A jury implicitly rejects a defensive theory when it finds the defendant guilty. *Zuliani*, 97 S.W.3d at 594.

## B. STANDARDS OF REVIEW

On appeal, when the defendant challenges the legal sufficiency of the evidence supporting the jury's rejection of his theory of self-defense,

> we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of murder beyond a reasonable doubt and also would have found against the appellant on the self-defense issue beyond a reasonable doubt.

*Saxton*, 804 S.W.2d at 914.

When a defendant challenges the factual sufficiency of the jury's rejection of a defense, we review all of the evidence in a neutral light and ask whether the State's evidence taken alone is too weak to support the finding and whether the proof of guilt,

---

amended section. Therefore, our analysis of this appeal is governed by the previous versions of the statute. *See* Act of May 16, 1995, 74th Leg., ch. 235, § 1, 1995 Tex. Gen. Laws 2141 (amended 2007) (current version at TEX. PENAL CODE ANN. § 9.32 (Vernon Supp. 2008)).

although adequate if taken alone, is against the great weight and preponderance of the evidence. *Zuliani*, 97 S.W.3d at 595.

## C. Discussion

### 1. Legal Sufficiency

The evidence established that appellant shot Logan with his gun and fled the scene. Barrera testified that Logan was standing inside his residence and was reaching for the front door when he was shot. Barrera did not hear Logan tell appellant that he was going to kill him. There was a bullet hole in the glass front door. A bullet that came from appellant's gun was recovered from Logan's body. Ranger Rivera testified that Logan was standing inside the residence behind the front door when he was shot by the shooter who was standing outside. He further testified that Logan's body was not moved after he was shot.

Moreover, there was no evidence that Logan had a weapon when he allegedly "came after" appellant. *See* TEX. PENAL CODE ANN. § 9.32. Therefore, the jury could have determined that appellant did not have a reasonable belief that he was protecting himself from Logan's use or attempted use of unlawful deadly force. *See id.* Finally, based on Deleon's testimony that appellant told her that he went to his truck, got his gun, and then shot Logan, the jury could have determined that a reasonable person in appellant's situation would have retreated. *See id.*

Viewing all the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact would have found against appellant on his self-defense issue. *Saxton*, 804 S.W.2d at 914. We overrule appellant's second issue.

## 2. Factual Sufficiency

The jury's decision to reject appellant's claim of self-defense ultimately hinges on appellant's credibility. *Miller v. State*, 177 S.W.3d 177, 183 (Tex. App.–Houston [1st Dist.] 2005, pet. ref'd). "Unless the available record clearly reveals a different result is appropriate . . . [we] must defer to the jury's determination concerning what weight to give contradictory testimonial evidence because resolution often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered." *Johnson v. State*, 23 S.W.3d 1, 8 (Tex. Crim. App. 2000). Therefore, after reviewing all of the evidence in a neutral light, we conclude that the State's evidence, taken alone, is not too weak to support the jury's rejection of appellant's self-defense claim. *See Zuliani*, 97 S.W.3d at 594-95. Furthermore, we cannot say that the verdict was clearly wrong or manifestly unjust. Accordingly, we conclude that the evidence is factually sufficient to support the jury's rejection of appellant's claim of self-defense. We overrule appellant's third issue.

## IV. CONCLUSION

We affirm the trial court's judgment.

NELDA V. RODRIGUEZ
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Memorandum Opinion delivered and
filed this 16th day of April, 2009.

12